# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SALT RIVER PIMA MARICOPA INDIAN COMMUNITY**<br>10005 East Osborn Road<br>Scottsdale, AZ 85256<br><br>   PLAINTIFF,<br><br>v.<br><br>**ALEX M. AZAR**, in his official capacity<br>as Secretary,<br>U.S. Department of Health & Human Services<br>200 Independence Ave, SW<br>Washington, DC 20201<br><br>**RADM MICHAEL D. WEAHKEE**, in his<br>official capacity as Principal Deputy Director,<br>Indian Health Service<br>5600 Fishers Ln<br>Rockville, MD 20857<br><br>   DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 18-2360<br><br><br><br>**COMPLAINT** |

## COMPLAINT FOR DECLARATORY, MANDAMUS, AND INJUNCTIVE RELIEF

The Plaintiff, for its causes of action against the Defendants named above, complains and alleges as follows:

## INTRODUCTION

1.     This action is brought by the Salt River Pima Maricopa Indian Community (Community) against the United States Secretary of Health and Human Services, and the Principal Deputy Director of the Indian Health Service (IHS) pursuant to 25 U.S.C. § 5331(a), an

–1–

express cause of action for relief related to disputes under the Indian Self-Determination and Education Assistance Act (ISDEAA).

2.     The Community operates a health services delivery program to carry out health care programs, services, functions and activities (PSFAs) for the Community's members and other eligible Indians in the Community's service area.  The Community currently does so under Title V of the ISDEAA, 25 U.S.C. § 5381, et seq., through its Title V Compact and Funding Agreement (FA) with the IHS.  The FA includes funding amounts negotiated for each fiscal year (FY) between the IHS and the Community to fund the PSFAs the Community performs on the federal government's behalf.

3.     During negotiations in 2017 between the Community and the IHS under the ISDEAA, the Community assumed a number of new PSFAs, previously carried out on the Community's behalf by the IHS, in a new Title V Compact and FA.  The parties agreed to language in the Compact and to most of the terms and funding amounts for a multi-year FA for FYs 2017-2018, but the parties were not able to agree on all of the funding and language issues for the FA.

4.     By letter dated August 4, 2017, the Community submitted a "final offer" (hereinafter "Final Offer") to the IHS under 25 U.S.C. § 5387(b) regarding the unresolved issues. By letter dated September 18, 2017, the IHS partially or fully rejected the Community's Final Offer on each of the unresolved issues.

5.     Because the ISDEAA at 25 U.S.C. § 5387(c)(1)(D) gives a tribe the option of entering into a severable portion of a final proposed funding agreement, the parties entered into the Compact and multi-year FA for FYs 2017-2018, effective September 24, 2017.  The FA

excluded the disputed language and funding issues that were the subject of the Final Offer rejected by the IHS.

6.      This action now challenges portions of the IHS's September 18, 2017 rejection of the Community's Final Offer per 25 U.S.C. § 5387(c)(1)(C).  The Community respectfully asks this Court for relief under Section 110 of the ISDEAA, which authorizes actions against the Defendants for money damages or injunctive relief against any action by an officer of the United States contrary to the ISDEAA, including injunctive relief to reverse the IHS's decision and compel the IHS to fund the FYs 2017-2018 FA as proposed.  25 U.S.C. § 5331(a); *see also id.* § 5391(a) (stating the word "contract" for purposes of Section 110 includes compacts and funding agreements, such as the Community's, under Title V of the ISDEAA).

## PARTIES

7.      The Plaintiff, Salt River Pima Maricopa Indian Community, is a federally recognized Indian tribe.[1]  The Community operates health care facilities in Arizona and provides health care services to its members and other eligible beneficiaries pursuant to its self-governance Compact and multi-year FA for FYs 2017-2018 with the IHS under Title V of the ISDEAA, 25 U.S.C. § 5381 et seq.

8.      Defendant Alex M. Azar, the Secretary of Health and Human Services (Secretary), has overall responsibility for carrying out all the functions, responsibilities, authorities, and duties of the U.S. Department of Health and Human Services ("the Department"), including oversight of the IHS, an agency within the Department.  He is sued in his official capacity.

---

[1] Dep't of the Interior, *Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs*, 83 Fed. Reg. 34,863, 34,866 (July 23, 2018).

9.      Defendant Rear Admiral Michael D. Weahkee is the Principal Deputy Director of

the IHS,[2] the agency within the Department charged by law with the responsibility for

implementing the ISDEAA and other health laws benefitting Alaska Natives and American

Indians on behalf of the United States.  25 U.S.C. § 1661(c)(3).  He is sued in his official

capacity.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under § 110(a) of the ISDEAA, 25 U.S.C. § 5331(a),

which provides in relevant part as follows:

> The United States district courts shall have original jurisdiction over any civil
> action or claim against the appropriate Secretary arising under this [Act]. . . .  In an
> action brought under this paragraph, the district courts may order appropriate relief
> including money damages, injunctive relief against any action by an officer of the
> United States or any agency thereof contrary to this [Act] or regulations
> promulgated thereunder, or mandamus to compel an officer or employee of the
> United States, or any agency thereof, to perform a duty provided under this [Act]
> or regulations promulgated hereunder (including immediate injunctive relief to
> reverse a declination finding under section 5321(a)(2) of this title or to compel the
> Secretary to award and fund an approved self-determination contract).

11.      Section 5331(a) is made applicable to self-governance compacts and funding

agreements under 25 U.S.C. § 5391(a).  A self-governance tribe, in lieu of administratively

appealing an IHS rejection of its final offer, may "directly proceed to initiate an action in a

Federal district court pursuant to section 5331(a) of this title."  25 U.S.C. § 5387(c)(1)(C).

12.      Venue is proper under 28 U.S.C. § 1391(c) because the Department is located in

the District of Columbia.

## STATUTORY BACKGROUND

---

[2] At this time, the IHS does not have a Director or an Acting Director.

–4–

13.     The ISDEAA authorizes Indian tribes and tribal organizations to assume responsibility to administer PSFAs the Secretary would otherwise provide under federal law to eligible American Indians and Alaska Natives.  25 U.S.C. § 5321(a)(1).  The purpose of the ISDEAA is to reduce federal domination of Indian programs and promote tribal self-determination and self-governance.  25 U.S.C. § 5302(b): *Cherokee Nation v. Leavitt*, 543 U.S. 631, 639 (2005).  The ISDEAA reflects the United States' commitment "to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities." 25 U.S.C. § 5302(b).

14.     Title V of the ISDEAA requires the Secretary to establish and carry out within the IHS a program known as the "Tribal Self-Governance Program."  25 U.S.C. § 5382.  Title V requires the Secretary to negotiate and enter into self-governance compacts and funding agreements with tribes and tribal organizations participating in the self-governance program.  25 U.S.C. §§ 5384, 5385.  The Community carries out its Compact and FA under Title V.

15.     Title V requires that each funding agreement shall, "as determined by the Indian tribe," include all PSFAs administered by the IHS under certain listed laws, including the Indian Health Care Improvement Act, 25 U.S.C. § 1601 *et seq.*  25 U.S.C. § 5385(b).

***Tribal Shares and the Secretarial Amount***

16.     Section 5385(b)(1) governs what PSFAs and funding are required to be included in funding agreements as determined by a participating self-governance tribe.  It states:

> Each funding agreement required under subsection (a) of this section shall, ***as determined by the Indian tribe,*** authorize the Indian tribe to plan, conduct, consolidate, administer, ***and receive full tribal share funding***, including tribal shares of discretionary Indian Health Service competitive grants (excluding congressionally earmarked competitive grants), for all programs, services, functions, and activities (or portions thereof), that are carried out for the benefit of

Indians because of their status as Indians without regard to the agency or office of the Indian Health Service within which the program, service, function, or activity (or portion thereof) is performed.

25 U.S.C. § 5385(b)(1) (emphasis added).

17.     The term "tribal share" as used in Title V is defined as meaning: "an Indian tribe's portion of all funds and resources that support secretarial programs, services, functions, and activities (or portions thereof) that are not required by the Secretary for performance of inherent Federal functions."  25 U.S.C. § 5381(a)(8).  The term "inherent Federal function" is defined for purposes of Title V as meaning: "those Federal functions which cannot legally be delegated to Indian tribes."  25 U.S.C. § 5381(a)(4).

18.     By statute, the amount of funding provided by the Secretary for operation of the PSFAs included in a funding agreement must "not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."  25 U.S.C. § 5325(a)(1); *see also id*. § 5396(a) (making § 5325(a) applicable to Title V compacts and funding agreements).  This amount is often referred to as the "Secretarial amount."  The words "not less than" establish a floor, not a ceiling, for direct program costs.

### *Contract Support Costs*

19.     In addition to the Secretarial amount, the Community is entitled to be paid contract support costs (CSCs) to fund the administrative and overhead costs of the PSFAs the Community compacted to perform on behalf of the IHS.  25 U.S.C. § 5325; *id*. § 5396(a) (mandatory application of § 5325 to Title V agreements).  CSCs fund administrative and other costs that tribes incur to carry out funding agreements but which are not provided in the Secretarial amount.  CSCs must not duplicate any portion of the Secretarial amount.

20.     There are three types of CSCs: (1) pre-award and start-up costs, which are one-time costs to plan, prepare for, and assume operation of new or expanded PSFAs, *see* 25 U.S.C. § 5325(a)(5), (6); (2) indirect CSCs, which are costs incurred for a common or joint purpose benefiting more than one PSFA, such as administrative and overhead costs, *see* 25 U.S.C. § 5325(a)(2); and (3) direct CSCs, which are expenses directly attributable to a certain PSFA but not captured in either the indirect cost pool or the Secretarial amount, such as workers' compensation insurance or other expenses the Secretary would not have incurred because, for example, the Government is self-insured, *see* 25 U.S.C. § 5325(a)(3)(A).  This action involves pre-award costs, indirect CSCs, and direct CSCs.

21.     The U.S. Supreme Court has held that the ISDEAA requires full payment of CSCs.  *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 185 (2012) ("[W]e hold that the Government must pay each tribe's contract support costs in full."); *Cherokee Nation*, 543 U.S. at 634 (2005) ("The [ISDEAA] specifies that the Government must pay a tribe's costs, including administrative expenses.").

22.     For the Community, as for most tribes, the full amount of indirect CSC is determined by multiplying a negotiated indirect cost rate by the amount of the direct cost base. The Community's FY 2017 indirect cost rate agreement with the Department of the Interior's Interior Business Center, which applies government-wide, calls for an indirect cost rate of 14.90% on a direct cost base comprised of "[t]otal direct costs, less capital expenditures and passthrough funds."  The Community's FY 2018 indirect cost rate was 17.40%, again using a direct cost base of total direct costs minus capital expenditures and passthrough funds.

***Final Offer Process***

23.     In negotiation of compacts and funding agreements, the Secretary shall at all times negotiate in good faith to maximize implementation of the self-governance policy.  25 U.S.C. § 5387(e).

24.     Title V of the ISDEAA provides for a "final offer" process in the event of a stalemate in negotiations for a compact or funding agreement.  Section 507(b) of the ISDEAA, 25 U.S.C. § 5387(b), explains as follows:

> In the event the Secretary and a participating Indian tribe are unable to agree, in whole or in part, on the terms of a compact or funding agreement (including funding levels), the Indian tribe may submit a final offer to the Secretary.  Not more than 45 days after such submission, or within a longer time agreed upon by the Indian tribe, the Secretary shall review and make a determination with respect to such offer.  In the absence of a timely rejection of the offer, in whole or in part, made in compliance with subsection (c) of this section, the offer shall be deemed agreed to by the Secretary.

25.     Section 507(c) of the ISDEAA, 25 U.S.C. § 5387(c)(1)(A), provides that, if the Secretary rejects a final offer, the Secretary shall provide timely written notification to the Indian tribe that contains a specific finding that clearly demonstrates, or that is supported by a controlling legal authority, that one or more of the following four reasons for rejection apply:

> (i) the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter;
>
> (ii) the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;
>
> (iii) the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
>
> (iv) the Indian tribe is not eligible to participate in self-governance under section 5383 of this title.

26.     In any civil action challenging the rejection of a final offer, such as this one, "the Secretary shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer (or a provision thereof)."  25 U.S.C. § 5387(d).

27.     When IHS fails to meet the strict standard for rejecting a final offer, the statutory remedy is mandamus or "immediate injunctive relief to reverse [the rejection] or compel the Secretary to award and fund" the agreement as proposed.  25 U.S.C. § 5331(a).

**GENERAL ALLEGATIONS**

28.     Prior to entering into the Title V Compact and FA with the IHS on September 24, 2017, the Community had in place a contract and annual funding agreement with the IHS under Title I of the ISDEAA.  The Title I agreement between the parties for FY 2017 funded and authorized the Community to perform and administer the following PSFAs: health education; community health care representatives; pharmacy; alcohol and substance abuse services; physician services; public health nursing; mental health; and social services.

29.     In the new Title V Compact and FA, the Community assumed PSFAs that IHS had, until that time, been carrying out for the Community's members.  For example, the FA added a broader range of patient health care services like family practice, pediatrics, optometry, dental, emergency and non-emergency services, and health promotion and disease prevention. The Community also newly assumed from the IHS the Purchased/Referred Care (PRC) Program in order to manage referrals for medical services and products that are not available from the Community's health center, and to purchase such services and products from outside providers for the Community's beneficiaries who are eligible for PRC.

30.     During the negotiation of the Title V Compact and the FYs 2017-2018 FA, the Community and the IHS agreed to language for a new Compact and most of the language and

funding for the FA, but the parties were not able to come to agreement on several issues.  On August 4, 2017, the Community submitted its Final Offer on these unresolved issues, including the four discussed in detail below that form the basis of this action.

31.     On September 18, 2017, the IHS issued a letter (hereinafter "IHS Response") partially or fully rejecting the Community's proposal as to each of the Final Offer issues.

32.     In a letter dated September 21, 2017, the Community agreed to the severable portion of the Final Offer that IHS did not reject, while reserving its right to appeal the portion that IHS did reject.  *See* 25 U.S.C. § 5387(c)(1)(D).

33.     The Community now exercises its right to initiate an action in this court to challenge IHS's partial rejection of the Final Offer.  *See* 25 U.S.C. § 5387(c)(1)(C).

34.     This case involves four issues related to the amount of funds the Community should have received from the IHS for FYs 2017-2018:

1) The IHS's refusal to transfer the unobligated balance of FY 2017 PRC funding available as of September 23, 2017;

2) The IHS's refusal to transfer the entire Secretarial amount for the PSFAs newly assumed by the Community in the FA, including revenues from Medicare, Medicaid, and private insurance that the IHS would otherwise have used to carry out the PSFAs on the Community's behalf;

3) The IHS's failure to pay the Community's full tribal shares associated with the Phoenix Service Unit/Phoenix Indian Medical Center; and

4) The IHS's rejection of the Community's claim for the CSCs associated with the funds described in numbers 1-3 above, plus certain pre-award costs.

## CAUSES OF ACTION

## COUNT I: CARRYOVER PRC FUNDING

35.     The allegations in Paragraphs 1-34 are incorporated herein by reference.

36.     The proposed final FA submitted to the IHS as part of the Community's Final

Offer would have added the following language as Section 9(D)(f) of the FA:

> FY 2017 PRC Balance.  The IHS has estimated that PRC obligations through
> June, 2017 were approximately $680,751.  Projecting that amount through
> September 23, 2017, the Community estimates that 2017 PRC obligations
> will be far below the Community's tribal shares for the PRC program in FY
> 2017.  The IHS will pay the SRPMIC the SRPMIC's FY 2017 unobligated
> PRC account balance available at September 23, 2017 within 10 days of the
> date of award.

37.     This proposed language for the FA is intended to capture the full unobligated

PRC balance in the Community's tribal share account for FY 2017 as of September 23, 2017,

and include that unobligated balance in the Community's multi-year FA for FYs 2017-2018.

38.     The IHS identified $2,250,477 as the Community's "tribal share" of PRC funds

for FY 2017 and estimated that its PRC obligations for the Community were approximately

$680,751 through June 30 of FY 2017, which is 3/4 into the FY.  *See* Final Offer at 2.  Projecting

that obligation rate to September 23, 2017, indicates that a large amount of the Community's

PRC tribal share for FY 2017 would remain unobligated.  The Community's proposed language

would require that the unobligated balance be included in the Community's FA.

39.     The IHS rejected adding the proposed language on the ground that "the proposed

funding exceeds the applicable funding level to which the tribe is entitled," per Section

5387(c)(1)(A)(i) of the ISDEAA.  IHS Response at 4.  The IHS contends that providing the full

unobligated balance would be contrary to Section 5325(a)(1), which requires that contract

funding be "not less than the amount that the Secretary would have otherwise provided for

operation of the programs or portions of programs *for the period covered by the contract*." IHS

Response at 4  (emphasis in original).[3]

40.     IHS's interpretation of Section 5325(a)(1) conflicts with the Community's

entitlement in Section 5385(b)(1) to "receive full tribal share funding."  Section 5325(a)(1)

requires that funding be "not less than" what the IHS would otherwise provide for its operation

of the PRC program for the period covered by the contract.  However, this is a floor, not a

ceiling, and does not conflict with providing the Community with the full unobligated balance of

its tribal share account for PRC as of September 23, 2017.

41.     The Compact and FA cover the last seven days of FY 2017.  The IHS argues that

Section 5325(a)(1) restricts the Community's funding for PRC to a 7 day pro-rata share of the

unobligated balance in the Community's FY 2017 tribal share account.  IHS Response at 4.  The

funding tables for the FA include $43,999 as that pro-rata share.  However, the "not less than"

language in Section 5325(a)(1) does not preclude the IHS from providing the full unobligated

balance as required in Section 5385(b)(1).  The IHS's interpretation would require forfeiture of

the remaining unobligated balance in the Community's tribal share account as of September 23,

2017, to other tribes.  That is contrary to Section 5385(b)(1), which entitles the Community to

"receive full tribal share funding."[4]

42.     The implementing regulations provide that "all tribal shares identified" in Section

5385(b)(1) and Section 5388(c), which makes Section 5325(a)(1) applicable to self-governance

---

[3] Section 5325(a)(1) is in Title I of the ISDEAA.  It is made applicable to Title V self-governance compacts and FAs by Section 5396(a).
[4] *See also* 25 U.S.C. § 5325(b) ("[T]he Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this Act.").

FAs, may be included in FAs.  This regulation runs counter to the IHS's argument that Section 5325(a)(1) limits the full tribal share funding that Section 5385(b)(1) requires.

43.     The IHS also rejected the proposed language on the ground that "the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot be legally delegated to an Indian tribe," per Section 5387(c)(1)(A)(ii).  IHS Response at 4.  The IHS argued that the proposed language interfered with the IHS's discretion to allocate its appropriated resources, which is an inherent federal function.  *Id.*

44.     The IHS relies on the decision in *Lincoln v. Vigil*, 508 U.S. 182 (1993), holding that IHS decisions allocating appropriated funds are not subject to judicial review under the Administrative Procedure Act (APA) when there is no law to apply to the agency decision.  Here, Section 5385(b)(1) is law to apply, and this appeal is brought under the ISDEAA, not the APA.  *Lincoln v. Vigil* does not apply.

45.     The IHS's rejection of the Community's final offer dated August 4, 2017, was contrary to the ISDEAA and its implementing regulations.  The IHS's rejection letter did not establish that the statutory rejection criteria the IHS allegedly relied on to reject the Community's funding request —25 U.S.C. § 5387(c)(1)(A)(i) and (ii)—apply.  The Secretary has not met his burden of proof, and the Community's proposal for PRC carryover funding should be deemed approved.

## COUNT II: THIRD PARTY REIMBURSEMENTS

46.     The allegations in Paragraphs 1-45 are incorporated herein by reference.

47.     When the IHS provides direct services to a tribe, the PSFAs are funded not only by funds appropriated by Congress, but also by third-party revenues—collections from

Medicare, Medicaid, and private insurers, for example.  Each year in its budget to Congress, the IHS estimates how much third-party revenue will be collected and available to spend on services, based on past collections.  *See, e.g.,* Dep't of Health & Human Servs., *Indian Health Service FY 2018 Justification of Estimates for Appropriations Committees,* at CJ-143 (reporting that in FY 2016, IHS collected $1.194 billion from third-party payers).  The Department has acknowledged that "[p]ublic and private collections represent a significant portion of the IHS and Tribal health care delivery budgets."  *Id.*

48.    The Community proposed that the IHS award $3,697,957 in third party revenues collected by the Secretary (*e.g.,* Medicare, Medicaid, private insurance reimbursements for services IHS provided to the Community's members and other eligible individuals in the Community's service area) that would otherwise be used by the IHS to carry out PSFAs serving the Community.  Final Offer at 3, Appendix B.

49.    The ISDEAA in Section 5325(a)(1) requires that "*[t]he amount of funds provided under the terms of [ISDEAA agreements] entered into pursuant to this chapter shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract. . . .*"  (emphasis added).  Section 5325(a)(1) requires that funding be in an "amount" no less than the IHS would otherwise provide to operate the program itself.  The IHS is free to fund the contract from IHS appropriations or third party revenues or a combination of both, so long as the IHS provides the "amount" required by Section 5325(a)(1).

50.    The IHS rejected the Community's proposal to assume the third-party funding on the ground that the proposed funding "exceeds the applicable funding level to which the tribe is entitled," per Section 5387(c)(1)(A)(i).  IHS Response at 7.  The IHS contends that these third-

party collections were not appropriations and thus were not within the scope of the funding required by Section 5325(a)(1).  *Id.*

51.      Section 5325(a)(1) cannot be reasonably read to make third-party revenues "legally unavailable" for contracting, and the IHS's argument has been rejected by this Court in *Pyramid Lake Paiute Tribe v. Burwell*, in which this Court explained that "the applicable funding level for a contract proposal under [the ISDEAA] is determined based on what the Secretary otherwise would have spent, not on the source of the funds the Secretary uses."  70 F.Supp.3d 534, 544 (D.D.C. 2014).

52.      The IHS's rejection of the Community's proposal to assume third-party funding that the IHS would have used to carry out PSFAs on the Community's behalf was contrary to the ISDEAA and its implementing regulations and to this Court's decision in *Pyramid Lake*.  The IHS's rejection letter did not establish that the statutory rejection criterion relied on—25 U.S.C. § 5387(c)(1)(A)(i)—applies.  Thus, the IHS inappropriately invoked that Section to reject the Community's funding request and has not met its burden of proof under Section 5398.

## COUNT III: SHARES OF PHOENIX SERVICE UNIT AND
## PHOENIX INDIAN MEDICAL CENTER

53.      The allegations in Paragraphs 1-52 are incorporated herein by reference.

54.      In its Final Offer, the Community requested that the IHS include in the FY 2017-2018 FA the Community's shares of both the IHS Phoenix Service Unit (PSU) and the IHS Phoenix Indian Medical Center (PIMC).  The PIMC is in part a regional medical referral center that provides specialized health care services to members of tribes in both Arizona and Nevada, including the Community.  The PIMC also operates in part as the IHS's PSU, providing direct

(non-specialty) health care services to members of six tribes in Arizona, including the

Community.

55.     In Appendix B to the FA submitted to the IHS as part of the Community's Final

Offer, the Community identified its tribal shares of PSU/PIMC to be $1,348,696.  The

Community explained in its Final Offer that it was reserving the right to separately negotiate

with the IHS the amount of the PSU/PIMC shares to be added to the FA, as the IHS during

negotiations promised it would provide additional information to identify the amount of tribal

shares available to the Community.  The IHS provided no further information, so the Community

included in its Final Offer the identified amount totaling $1,348,696, which represents the shares

of the PSU and the referral portion of the PIMC that could be attributed specifically to the

Community.

56.     The IHS partially rejected this proposal on the ground that "the amount of funds

proposed in the final offer exceeds the applicable funding level to which the tribe is entitled."

IHS Response at 8.  The IHS calculated the Community's share of the PSU to be only $430,306,

and the Community's share of the PIMC referral services to be $0.  Although the IHS

acknowledged that "[t]he regional referral portion of the PIMC is compactible in its entirety," it

argued that these services are not divisible into tribal shares because dividing them would make

the PIMC "financially unsustainable as a referral center, which is the purpose for which

Congress has funded the PIMC." *Id*.  Thus, the IHS rejected the Community's proposal to be

awarded an additional $918,390 for tribal shares of the PSU/PIMC.

57.     The ISDEAA entitles the Community to "***full tribal share funding*** . . . for ***all***

programs, services, functions, and activities (or portions thereof), that are carried out for the

benefit of Indians because of their status as Indians without regard to the agency or office of the

Indian Health Service within which the program, service, function, or activity (or portion thereof) is performed."  25 U.S.C. § 5385(b)(1) (emphasis added).  There is no exception for facilities or PSFAs the agency deems compactible but not divisible.  Moreover, the Community did not propose to compact all of the referral PSFAs of the PIMC, but only that share that *can* be separated out and identified specifically to support the Community.  The IHS's partial rejection of the Community's Final Offer with respect to the tribal shares of PSU/PIMC is contrary to the ISDEAA.

58.     The IHS also argued that the Community's proposed amount for PSU/PIMC shares was excessive because the Community's figures include "amounts that consist of reimbursement from third-party payors for services performed, and which are not funds appropriated by Congress for the IHS."  IHS Response at 8.  As explained above in Count II, however, the "Secretarial amount" that the IHS must transfer to the Community to carry out the PSFAs under Section 5325(a)(1) includes not just appropriated funds but third-party revenues that would otherwise be used to support the PSFAs.

59.     Because the IHS did not "clearly demonstrate" that the statutory rejection criterion on which it relied—25 U.S.C. § 5387(c)(1)(A)(i)—applies, the Secretary has not met his burden of proof under Section 5398, and the Community's Final Offer on PSU/PIMC tribal shares must be deemed approved and awarded as proposed.  25 U.S.C. § 5387(b).

## COUNT IV: CONTRACT SUPPORT COSTS

60.     The allegations in Paragraphs 1-59 are incorporated herein by reference.

61.     As explained in paragraphs 19-22 above, the ISDEAA requires the IHS to pay CSCs for certain direct and indirect costs of carrying out the PSFAs for which the Community has assumed responsibility under the FA.

62.     The parties dispute the amount of CSCs due in both FY 2017 and FY 2018, primarily due to their disagreement on the funding issues described in Counts I, II, and III above: PRC carryover, third-party revenues, and PSU/PIMC shares.  The ISDEAA dictates that CSCs "shall be added" to the Secretarial amount, 25 U.S.C. § 5325(a)(2), so the general rule is that the bigger the Secretarial amount, the bigger the CSC entitlement.  To the extent the Community prevails on Counts I-III, it will increase the size of the direct cost base, creating a greater indirect cost need.  It will also increase the direct CSC need for fringe benefits and other costs.

63.     In its Final Offer, the Community requested for FY 2017 a total CSC award of $1,840,656, while the IHS agreed to pay $1,527,507, leaving a shortfall of $313,149.  This figure includes $251,460 in eligible pre-award costs for which the IHS has so far refused to reimburse the Community.  *See* 25 U.S.C. § 5325(a)(5), (6).

64.     For FY 2018, the Community requested in its Final Offer a total CSC award of $5,973,751, while the IHS agreed to pay $2,526,437, leaving a shortfall of $3,447,314.

65.     Thus, for both FY 2017 and FY 2018, the IHS has refused to pay the Community's full CSC requirement, in violation of Sections 5325(a)(2), (3), (5), and (6), as interpreted by the U.S. Supreme Court in the *Ramah* and *Cherokee* cases cited above.  Thus, the IHS inappropriately invoked 25 U.S.C. § 5387(c)(1)(A)(i) to reject the Community's funding request, and it has not met its burden of proof under Section 5398.

**PRAYER FOR RELIEF**

66.     In accordance with 25 U.S.C. § 5331(a), the Community respectfully asks that this Court:

A. Declare that the Defendants violated the ISDEAA by rejecting the Community's Final Offer with respect to the four issues brought forward in this complaint;

B. Grant injunctive and mandamus relief to reverse the IHS's partial rejection of the Final Offer on the four issues described above and to compel the Defendants to enter into the FYs 2017-2018 FA with respect to those four claims and fully fund them as proposed by the Community;

C. Award interest on the amount in subparagraph B from the date of the decision rejecting the Final Offer under the Prompt Payment Act or other applicable law;

D. Award reasonable attorney fees and expenses in favor of the Community under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law; and

E. Grant such other relief as the Court deems just.

Respectfully submitted,


 s/ Kaitlyn Klass
Kaitlyn Klass (DC Bar No. 1032219)
Hobbs, Straus, Dean, & Walker LLP
2120 L St. NW, Suite 700
Washington, DC  20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

Geoffrey D. Strommer, *pro hac vice pending*
Stephen D. Osborne, *pro hac vice pending*
Hobbs, Straus, Dean & Walker, LLP
516 SE Morrison Street, Suite 1200
Portland, OR 97214

503-242-1745 (Tel.)
503-242-1072 (Fax)

Attorneys for the Salt River Pima Maricopa Indian Community

DATED: October 11, 2018