UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALT RIVER PIMA-MARICOPA INDIAN COMMUNITY,<br><br>*Plaintiff*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., *et al.*,<br><br>*Defendants*. | No. 18-cv-02360 (DLF) |

### MEMORANDUM OPINION

Salt River Pima-Maricopa Indian Community brings this action against the Secretary of Health and Human Services and the Acting Director of the Indian Health Service (IHS), seeking declaratory and injunctive relief. Salt River alleges that IHS failed to pay funds owed for Salt River's operation of certain health care programs at the Salt River Health Clinic, in violation of the Indian Self-Determination and Education Assistance Act (ISDEAA), *see* 25 U.S.C. §§ 5301 *et seq*. Before the Court is the plaintiff's motion for summary judgment, Pl.'s Mot., Dkt. 71, and the defendants' cross motion for summary judgment, Defs.' Mot., Dkt. 74. For the reasons that follow, the Court will grant in part and deny in part the parties' motions.

**I.   BACKGROUND**

    **A.   Statutory Background**

The ISDEAA authorizes federally recognized Indian tribes to operate certain programs and services that would otherwise be provided by the federal government through IHS, for the benefit of tribal members. *See* 25 U.S.C. §§ 5301 *et seq*; *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 252 (2016). Among the programs operated by IHS are health care programs authorized under the Snyder Act, 25 U.S.C. § 13, and the Indian Health Care Improvement Act

1

(IHCIA), 25 U.S.C. §§ 1601 *et seq*.  Tribes may enter self-determination contracts—or Title I contracts—with IHS to assume responsibility for such programs.  *Id.* §§ 5321–31.  Tribes that meet additional financial management standards may enter into self-governance compacts—or Title V compacts—to administer programs with greater operational flexibility.  *Id*. §§ 5381–99.

Tribes entering into ISDEAA agreements receive funding from IHS to operate the transferred programs.

*First*, tribes receive the funding amount that IHS "would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."  *Id*. § 5325(a)(1).  That funding is termed the "secretarial amount."  *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 186 (2012).  If a program administered by IHS benefits multiple tribes, one tribe may assume responsibility for the portion of the program benefiting its members, and the amount owed following transfer are the "tribal shares."  25 U.S.C. § 5385(b)(1).

*Second,* IHS must provide funding for "contract support costs."  *Id.* § 5325(a)(2).  These are "reasonable costs" borne by the tribe that would not be incurred if the federal government directly operated the program, *id*. § 5325(a)(2)(A), or costs funded by "resources other than" program-specific appropriations, *id*. § 5325(a)(2)(B).  Contract support costs may include: one-time startup costs for assuming the operation of a program; direct costs attributable to a specific program such as state workers' compensation fund payments; or indirect costs such as administrative or overhead costs attributable to multiple or jointly-operated programs.  *See id.* § 5325(a)(2)–(3); *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 635 (2005).  IHS's Indian Health Manual (IHM) sets forth various methodologies for calculating contract support costs, which are often incorporated by reference in ISDEAA contracts.  *See* IHM § 6-3.2E, Dkt. 18-1.

Contracting tribes also receive "third-party revenues"—that is, revenues from sources other than IHS, to operate the transferred benefit programs. For example, the IHCIA authorizes tribes to collect revenues from private insurers, tortfeasors, worker compensation funds, and Medicare and Medicaid programs, in connection with transferred benefit programs. *See* 25 U.S.C. §§ 1621e, 1641. Third-party revenues such as those obtained under the IHCIA are not included in the secretarial amount owed by IHS. *Fort McDermitt Paiute & Shoshone Tribe v. Becerra*, 6 F.4th 6, 14 (D.C. Cir. 2021). The ISDEAA recognizes that third-party revenues do not reduce the amount that IHS owes under a Title I contract or Title VI compact. *Id.* § 5325(m)(2); *id.* § 5388(j) ("[Supplemental] funds shall not result in any offset or reduction in the amount of funds the Indian tribe is authorized to receive under its [Title V] funding agreement.").

The ISDEAA sets forth a process for negotiating the terms and funding amounts in a Title V compact. If the tribe and the agency are unable to agree on terms, the tribe may submit a "final offer" for the compact to the agency. *Id.* § 5387(b). IHS may reject a Title V final offer only if the agency provides a "timely written notification" of rejection, *id.* § 5387(c)(1)(A), based on one of four statutory criteria, including that "the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under [the ISDEAA]," *id.* § 5387(c)(1)(A)(i). The tribe may enter into the agreed-upon portions of the compact while retaining the right to appeal the rejected portions in federal court. *Id.* §§ 5387(c)(1)(D)–(2).

B.   **Factual and Procedural Background**

Salt River is a federally recognized tribe located in Maricopa County, Arizona. *See* Defs.' SOF ¶ 4, Dkt. 77-1. In that region, IHS oversees the Phoenix Area Indian Health Service, and its component Phoenix Service Unit, which are administrative entities through which the agency provides direct, non-specialty medical services to tribal members. *Id.* ¶¶ 1–2. The Phoenix Indian Medical Center (PIMC) is a physical facility serving as the primary care facility for multiple tribes,

3

including Salt River, covered by the Phoenix Service Unit. *Id.* ¶ 2. PIMC also serves as the regional referral unit for secondary specialty inpatient and outpatient services for Phoenix and other Service Units. *Id.*

Salt River operates the Salt River Health Clinic, at which the tribe previously provided care programs under a Title I ISDEAA contract. *Id.* ¶ 4. On October 29, 2014, Salt River sent a letter of intent to enter into a Title V compact, to continue to operate and to take over additional programs provided at the Clinic. *Id.* ¶ 5. The letter also sought to take over Salt River's tribal shares of non-specialty healthcare services and administrative functions provided through the Phoenix Service Unit. AR 67–68, Dkt. 18-1.

Following negotiations, Salt River and IHS were unable to reach a final agreement on the proposed Title V compact. On August 4, 2017, Salt River sent a final offer to IHS identifying several unresolved funding issues. AR 71–137. On September 5, the agency responded to and declined in part portions of the final offer, including the funding terms for (1) certain third-party revenues, AR 144; (2) costs related to the tribal shares for the Phoenix Service Unit, AR 145–46; and (3) contract support costs for those tribal shares, AR 146–48. The parties entered into a Title V compact on the consensus portions of the compact. AR 1–65.

Salt River filed this action on October 11, 2018, to litigate the unresolved funding terms. Compl., Dkt. 1. The operative complaint asserts three claims for costs: (I) $3,697,957 in third-party revenues that IHS allegedly collected from Medicare, Medicaid, and private insurers to fund programs at the Salt River Health Clinic; (II) $918,390 for Salt River's tribal shares of services provided by the Phoenix Service Unit and PIMC; (III) $159,800 in contract support costs for the tribal shares sought in Count II. Sec. Am. Compl., ¶¶ 37–41, 44–47, 53. Salt River moved for

summary judgment, seeking an order requiring IHS to include those amounts in its compact. Pl.'s Mot., Dkt. 71. The agency cross-moved for summary judgment. Defs.' Mot., Dkt. 74.

## II.    LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one that could affect the outcome of the lawsuit. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (citation modified). A party opposing summary judgment must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015) (citation modified).

Courts in this district review *de novo* questions of legal interpretation under the ISDEAA. *E.g.*, *Jamestown S'Klallam Tribe v. Azar*, 486 F. Supp. 3d 83, 87 (D.D.C. 2020); *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534, 541–42 (D.D.C. 2014). The Act provides, however, that each provision of the statute or compact "agreement shall be liberally construed for the benefit of the Indian tribe[,] . . . and any ambiguity shall be resolved in favor of the Indian tribe." 25 U.S.C. § 5392(f); *see* 25 C.F.R. § 900.3(b)(11) (agency regulations providing the same). As for factual disputes, the ISDEAA provides that the agency "shall have the burden of demonstrating by

5

clear and convincing evidence the validity of the grounds for rejecting" a tribe's final offer of a Title V compact. 25 U.S.C. § 5387(d); *see Red Lake Band of Chippewa Indians v. HHS*, 718 F. Supp. 3d 50, 59 (D.D.C. 2024) (citation modified). A court's review under the ISDEAA is not limited to the administrative record. *Fort McDermitt Paiute & Shoshone Tribe v. Price*, No. 17-cv-837 (TJK), 2018 WL 4637009, at *2 n.2 (D.D.C. Sept. 27, 2018).

## III.    ANALYSIS

### A.    Third-Party Revenues

Salt River claims that it is entitled to third-party revenues that IHS purportedly diverted from non-Clinic sources to fund Clinic operations. Pl.'s Mot. at 18–19. According to Salt River, when IHS operated the Salt River Health Clinic, the agency relied on three sources of funding: IHS appropriations, third-party revenues generated at the Clinic, and third-party revenues generated elsewhere. *Id.* The parties do not dispute that program-specific appropriations are included in the secretarial amount provided under the compact, and that the tribe now directly collects third-party revenues generated by providers stationed at the Clinic. Only the third category is in dispute. Because it believed it could no longer access that third category, Salt River's final offer sought an additional $3,697,957 in funding. AR 406–10. IHS rejected that portion of the offer during administrative proceedings, on the grounds that it "exceed[ed] the applicable funding level to which the tribe is entitled under" statute. *Id.* 144. The agency explained that the tribe would "have the opportunity to collect third-party reimbursement associated with" the claim and that "IHS will correspondingly lose the capacity to seek recovery." *Id.*

In *Fort McDermitt*, the D.C. Circuit explained that the ISDEAA explicitly treats third-party revenues such as Medicare or Medicaid income as "supplemental funding to that negotiated in the [Title V] funding agreement." 6 F.4th at 14 (citing 25 U.S.C. § 5388(j)). Under a Title V compact, IHS is obligated to provide the secretarial amount it "would have otherwise provided for the

6

operation of the program[] . . . for the period covered by the contract."  25 U.S.C. § 5325(a)(1).  But the statute "expressly excludes third-party income from the secretarial amount."  *Fort McDermitt*, 6 F.4th at 14 ("Because income from third parties is 'supplemental' to the funds negotiated in a funding agreement, it must be separate from those funds.").  Because tribes participating in self-governance "may elect to bill for and receive the [third-party] income directly," they are not entitled to "double-dip[]" by also recouping those revenues from IHS.  *Id.* (citing 25 U.S.C. §§ 1603(25), 1641(d)(1)).  Thus, the agency may "exclude the value of Medicare and Medicaid reimbursements from the secretarial amount" under a Title V compact.  *Id*.

Salt River argues that *Fort McDermitt* does not preclude compensation for third-party revenues diverted from *other* IHS programs, because the tribe cannot "collect[] th[ose] reimbursements directly" under a self-governance compact.  *Fort McDermitt*, 6 F.4th at 13; *see* Pl.'s Mot. at 18–19 (citing *Pyramid Lake*, 70 F. Supp. 3d at 544).  But the Court need not decide whether *Fort McDermitt* contemplates such a carveout because Salt River has not shown that any funding diversion actually occurred.

Salt River produces no direct evidence that IHS used third-party revenues generated at other facilities to support the Clinic.  To the contrary, IHS attests that it is not the agency's "policy or practice to use third-party revenue generated at . . . any other non-clinic source to support the operations and expenditures of a Phoenix Area IHS clinic," and that "IHS did not do so at the Salt River Clinic."  Todecheenie Decl. ¶ 13, Dkt. 74-2.  Moreover, statutory constraints limit the agency's ability to divert Medicare and Medicaid reimbursements.  *See* 25 U.S.C. § 1641(c)(1)(B).  The IHCIA provides that any reimbursements must first be used to improve the facility where those reimbursements are generated, to achieve compliance with the requirements of Titles XVIII or XIX of the Social Security Act.  *Id.*  If excess funds remain, IHS must then engage in

"consultation with the . . . tribes . . . served by the Service unit" before diverting funds to any other Service Unit or facility. *Id.* Nothing in the record suggests that any excess funds were generated, or that IHS engaged in tribal consultations with any of the six tribes served by the Phoenix Service Unit as required before diverting funds.

To infer that third-party revenues were diverted, Salt River relies on cost center reports that IHS generated for the Salt River Health Clinic for fiscal years (FYs) 2012 through 2016. IHS cost center reports display the "revenues, expenditures, and balances associated with the IHS operation of given program for a given period of time." Pl.'s Mot. at 19. The "Budget Activity Program" line item in a cost center report "identifies the source of funding, including appropriated funds (for example, 'Hospitals and Clinics' and 'Dental'), and third-party revenues (e.g., Medicare, Medicaid, Private Insurance, and, in some years, VA IHS Reimbursement)." Defs.' Mot. at 30; *see* AR 402–06. Cost center reports "do not accurately reflect the Secretarial amount and are not ordinarily relied upon [by the agency] in determining the amount of funding due under an ISDEAA contract."[1] Reidhead Decl. ¶ 13, Dkt. 74-3.

The cost center reports show that IHS's projections for *total* third-party revenues used to support the Clinic amounted to $18,270,947 for FYs 2012 through 2016, but that projections for revenues generated by providers *stationed at* the Clinic only amounted to $6,898,379. AR 406–410 (sum of Allowances from Medicare, Medicaid, Private Insurance, Buybacks and VA IHS Reimbursement columns). Thus, argues Salt River, that $11,372,568 difference must have resulted

---

[1] Salt River takes the position that the agency's contemporaneous lack of reliance on the cost center reports is not a material factual dispute. *See* Pl.'s Opp'n at 17, Dkt. 78. Moreover, that IHS provided the reports to Salt River during compact negotiations, *see* Defs.' SOF ¶ 10, Dkt. 77-1, is not evidence that the agency internally relied on that data to make funding determinations.

8

from IHS supplementing the Clinic's funding with third-party revenues generated at other IHS facilities. Pl.'s Mot. at 33.

But Salt River does not dispute that the cost center report data was incomplete for two reasons. *First*, the tribe did not request and IHS did not provide data for third-party revenues collected at the Clinic for providers *not* stationed at the Clinic. *See* Pl.'s Opp'n at 19. Specifically, IHS attests that for FYs 2012 through 2016, the agency collected at the Clinic roughly $2,690,593 in revenue generated by specialty providers stationed at PIMC or other facilities, $962,173 in onsite pharmacy revenues, $240,654 in revenues for prescriptions filled at the pharmacy but written by outside providers, and $20,360 in revenues for dental services. Todecheenie Decl. ¶ 10 & Ex. B. The Clinic continued to host visiting providers and to offer pharmacy services after the tribe assumed responsibility, so Salt River was able to continue to bill directly for services by outside providers. *Id.* ¶ 15. *Second*, the cost center reports reflect only projections subject to further adjustments and reconciliation. *Id.* ¶¶ 6–8. IHS's financial system reflects that the actual third-party revenue expenditures for FYs 2012 through 2016, accounting for adjustments and revenue carryover, amounted to only about $13.8 million. *Id.* ¶ 8. Taken together, the non-Clinic provider collections and the data adjustments account for the revenue gap reflected in the cost center reports and refute any inference that IHS diverted third-party revenues.[2]

---

[2] Salt River objects to the agency's reliance on evidence, including the Todecheenie declaration and collections data, proffered for the first time during litigation. But the agency introduced such evidence in response to novel arguments and evidence, *see e.g.*, Brown Decl., Dkt. 71-1, that Salt River did not raise until its second motion for summary judgment—namely, that the claimed third-party revenues were diverted from other IHS facilities. Moreover, the agency's evidence is not inconsistent with the stance the agency took during administrative proceedings. *Cf. Chiquita Brands Int'l, Inc. v. SEC*, 805 F.3d 289, 299 (D.C. Cir. 2015) (An agency is not "bar[red] . . . from merely elaborating on the consistent stance the agency articulated below."). Accordingly, the Court will consider the additional collections and data adjustments in evaluating Salt River's diversion theory.

Salt River's sole evidence of diversion are the assertions in the Deveau declaration, Dkt. 71-2.  Deveau asserts, based on his analysis of the cost center reports, that the disputed revenues were "likely generated outside the [Salt River] Clinic and transferred into the Clinic budget for IHS to supplement and operate the [Salt River]Clinic." *Id.* ¶ 10.  And Salt River proffers—for the first time in its opposition brief, Pl.'s Opp'n at 19–20—that Deveau's opinion is expert testimony admissible under Federal Rule of Evidence 702.  That rule requires expert testimony to be based on "sufficient facts or data," Fed. R. Evid. 702(b).  Even when an expert relies upon his experience, "the reliability criterion remains a discrete, independent, and important requirement for admissibility." *Est. of Gaither ex rel. Gaither v. District of Columbia*, 831 F. Supp. 2d 56, 68–69 (D.D.C. 2011) (citation modified).  Expert testimony "that rests solely on 'subjective belief or unsupported speculation' is not reliable." *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 6 (D.D.C. 2002) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)).  "[A] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" to admit the expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Deveau's proffered opinion relies exclusively on the IHS cost center reports in the administrative record.  Deveau Decl. ¶¶ 3, 8.  He infers from the mere existence of a revenue gap in the cost center reports that the agency must have "earned [third-party revenues] somewhere outside the SR Clinic." *Id.* ¶ 8.c.  But, as noted, it is undisputed that the cost center reports contained incomplete data.  Because Deveau's inference amounts to little more than speculation, and there is "simply too great an analytical gap between the data" and his conclusion, *Joiner*, 522 U.S. 136 at 146, the Court concludes his opinion is inadmissible.

In sum, the undisputed evidence does not show that IHS diverted third-party revenues to fund the operations of the Salt River Health Clinic. *Fort McDermitt* thus governs this case: The general rule that the ISDEAA "excludes third-party income from the secretarial amount" applies. 6 F.4th at 14. Accordingly, the Court finds that IHS properly rejected the tribe's claim for third-party revenues, and it will deny Salt River's motion for summary judgment and grant the agency's cross motion.

### B. Tribal Shares

On Claim II, for the unpaid portion of Salt River's tribal shares of the Phoenix Service Unit, the agency concedes that it is obligated to pay an additional $664,057 for FY 2018, as well as approximately $12,000[3] for the seven days of FY 2017 operated under the compact. *See* Defs.' Reply at 17, Dkt. 80. Accordingly, the Court will enter judgment in favor of Salt River in the amount of $664,057, plus the amount owed for FY 2017 to be calculated by the parties.

### C. Contract Support Costs

In addition to the above, Salt River claims in Count III that it is entitled to additional contract support costs for the tribal shares awarded under Count II. The ISDEAA provides that contract support costs "shall be added" to the secretarial amount to reimburse qualifying expenses that "incurred" by the tribe. 25 U.S.C. §§ 5325(a)(2)–(3), 5304(f). The process for negotiating indirect contract support costs is set forth in detail in the IHS manual. At a high level, the manual provides that preliminary indirect contract support costs may be calculated "[i]n advance of the contract year" by multiplying a negotiated indirect cost rate by the direct cost base, *see* IHM, § 6-3.2E(1)a, or negotiated as an up-front lump sum payment, *id.* § 6-3.2E(2). At the end of the

---

[3] The agency represents that it is in the process of calculating the exact amount owed for the seven days in FY 2017. *See* Defs.' Reply at 17 n.4.

contract year, those costs are subject to a "final reconciliation" accounting for, among other things, adjustments to the direct cost and the secretarial amount, pass throughs and exclusions, and the applicable indirect cost rate. *Id.* § 6-3.2E(1)b. Regardless of the methodology used, the IHS manual provides that final amounts must be "consistent with the definition," *id.* § 6-3.2E(1)–(4), provided under 25 U.S.C. § 5325(a). That statutory provision mandates that contract support costs are limited to the "reasonable and allowable costs" actually incurred by the tribe. *See* 25 U.S.C. § 5325(a)(3)(A) (providing that such costs are to "reimburs[e]" the tribe).

Salt River does not dispute that it "did not expend the amount it claims in" contract support costs. Pl.'s Opp'n at 41. That admission defeats the tribe's claim: The ISDEAA does not authorize the reimbursement of contract support costs if the tribe "never incurred [those] administrative costs" to begin with. *Samish Indian Nation v. United States*, 419 F.3d 1355, 1367 (Fed. Cir. 2005). Salt River contends that the additional costs were not incurred *because* of the agency's tribal shares underpayment. *See* Pl.'s Opp'n at 41 ("[Tribal shares] not paid cannot be expended, reducing the costs 'incurred' and thus the amount IHS owes."). But that does not alter the fact that the tribe is not entitled to reimbursement for non-expenditures under the ISDEAA. 25 U.S.C. § 5325(a)(3); *Pyramid Lake*, 70 F. Supp. 3d at 545 ("Nothing in the Act requires the Secretary to provide a windfall to a tribe."). Nor does IHM's provision for payments in advance of a contract year, *see* IHM § 6-3.2E(1)–(2), suggest that Salt River is entitled to a payment at present. The manual explains that up-front rate-based payments are subject to "final reconciliation" at the end of the contract year, thus accounting for any over- or under-payment of incurred costs. *See id.* § 6-3.2E(1)(b)(vi). And under any methodology, the contract support costs ultimately paid must be consistent with the ISDEAA statute. *Id.* § 6-3.2E(1)–(4) (citing 25 U.S.C. § 5325(a)(2)–(3)). Thus, the tribe is only entitled to recover the amount that it actually "incurred," 25 U.S.C.

12

§ 5325(a)(3)(A)(ii), in additional contract support costs—in this case, nothing. *See* Pl.'s Opp'n at 41.

Accordingly, because Salt River has not presented evidence of reasonable and allowable contract support costs incurred, the Court will grant the agency's motion for summary judgment with respect to Count III.

## CONCLUSION

For these reasons, the plaintiff's Motion for Summary Judgment, Dkt. 71, is granted in part and denied in part; and the defendants' cross motion for summary judgment, Dkt. 74, is granted in part and denied in part. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

August 14, 2025